**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-2916

MARY FLORES, individually and on behalf of E.F., a minor child;
JOEL FLORES, individually and on behalf of E.F., a minor child;
BERTHA CEJA on behalf of V.S., a minor child;
MARIA CASTANEDA on behalf of M.F. and J.F., minor children;
B.F., an individual, on behalf of herself and those similarly-situated;
JOHN DOES 1-150, minor children;

      Plaintiffs,

v.

VICTORY PREPARATORY ACADEMY, a governmental entity;
RON JAJDELSKI, in his individual and official capacities;
JEFF SMITH, in his individual and official capacities;
CAMIL DELACRUZ, in her individual and official capacities;
ROSALIE MONTANO, in her individual and official capacities;
NORMA CLINKINBEARD, in her individual and official capacities;
JEFF REED, in his individual and official capacities;
JAMES SEAY, in his individual and official capacities;
NANCY BROOKS, in her individual and official capacities;
JOHN DOES 1-10, in their individual and official capacities;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

## I.     INTRODUCTION

This case concerns serial violations of the First and Fourteenth Amendments of the United States Constitution by Victory Preparatory Academy ("VPA") after its students exercised their fundamental constitutional rights by engaging in a peaceful protest of school administration. Through their protest, the students advocated for, *inter*

*alia*, additional school spirit activities, a voice in the administration, and a relaxation of the school's rigid rules of conduct. So, on September 28, 2017, most if not all of the VPA student body protested the school administration by refusing to recite the VPA school pledge.

VPA's heavy-handed response to this silent and peaceful protest illustrated the reason VPA's students were compelled to express dissent. Ron Jajdelski, the school's Chief Executive Officer, and other school administrators suspended every single high school student – over 120 students – for their exercise of free speech. VPA then suspended and/or expelled numerous students who interviewed with press about the protest or were critical of the administration on social media.  When parents coming to pick up the suspended students asked to speak with administrators, they were threatened with immediate arrest and the pressing of criminal charges. Two parents, Mary and Joel Flores, covered the mass-suspension in a local Spanish-language newspaper they owned named *La Prensa*. For their critical coverage, Mary and Joel Flores were threatened with criminal prosecution and indefinitely barred from school property. At no time did VPA afford any of its students or their parents any due process by which to challenge the actions taken against them.

It is well-established that students do not abandon their constitutional rights at the schoolhouse gates. The Supreme Court has long given "scrupulous protection" to individual freedoms in the educational context in order to avoid "strangl[ing] the free mind at its source and teach[ing] youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624,

637 (1943). Yet, VPA has taught its students, parents, and community that their well-established constitutional rights are subservient to the whims of the VPA administration. Through this lawsuit, Plaintiffs, on their own behalf and on behalf of all similarly situated students, seek to teach VPA and its administration that they are not, in fact, supreme to the United States Constitution.

## II.      JURISDICTION, VENUE, AND PARTIES

1.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Venue is proper within this District under 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the jurisdiction of the United States District Court of Colorado. Defendant VPA is located in this District and all of the individual parties were residents of the State of Colorado at the time of the events giving rise to this litigation.

3.      Plaintiff Mary Flores is a resident of and domiciled in the State of Colorado.

4.      Plaintiff Joel Flores is a resident of and domiciled in the State of Colorado.

5.      Plaintiff B.F. was a minor at the time the events giving rise to this litigation took place and is a resident of and domiciled in the State of Colorado.

6.      Plaintiff E.F., a minor, is a resident of and domiciled in the State of Colorado.

7.      Plaintiff V.S., a minor, is a resident of and domiciled in the State of Colorado

8.      Plaintiff M.F., a minor, is a resident of and domiciled in the State of Colorado.

9.      Plaintiff J.F., a minor, is a resident of and domiciled in the State of Colorado

10.     Defendant Victory Preparatory Academy is a charter school located at 5701 Quebec Street, Commerce City, CO 80022.

11.     Defendant Victory Preparatory Academy is authorized through the Colorado Charter School Institute pursuant to Colo. Rev. Stat. § 22-30.5-100, *et seq.*

12.     Defendant Victory Preparatory Academy employed at all relevant times Defendants Ron Jajdelski, and John Doe Defendants 1-5.

13.     Defendant Victory Preparatory Academy is a proper entity to be sued under 42 U.S.C. § 1983.

14.     At all times relevant to the subject matter of this litigation, Defendant Ron Jajdelski was a resident of Colorado.

15.     At all times relevant to the subject matter of this litigation, Defendant Ron Jajdelski was acting under color of state law in his capacity as Chief Executive Officer of Victory Preparatory Academy.

16.     Defendant Jeff Smith was, at all relevant times, a Board Member of Defendant VPA and a resident of the State of Colorado.

17.     In his role as Board Member, Defendant Smith is responsible for adopting and implementing policies for Defendant VPA.

18.     Defendant Camil DeLaCruz was, at all relevant times, a Board Member of Defendant VPA and a resident of the State of Colorado.

19.     In her role as Board Member, Defendant DeLaCruz is responsible for adopting and implementing policies for Defendant VPA.

20.     Defendant Rosalie Montano was, at all relevant times, a Board Member of Defendant VPA and a resident of the State of Colorado.

21.     In her role as Board Member, Defendant Montano is responsible for adopting and implementing policies for Defendant VPA.

22.     Defendant Norma Clinkinbeard was, at all relevant times, a Board Member of Defendant VPA and a resident of the State of Colorado.

23.     In her role as Board Member, Defendant Clinkinbeard is responsible for adopting and implementing policies for Defendant VPA.

24.     Defendant Jeff Reed was, at all relevant times, a Board Member of Defendant VPA and a resident of the State of Colorado.

25.     In his role as Board Member, Defendant Reed is responsible for adopting and implementing policies for Defendant VPA.

26.     Defendant James Seay was, at all relevant times, a Board Member of Defendant VPA and a resident of the State of Colorado.

27.     In his role as Board Member, Defendant Seay is responsible for adopting and implementing policies for Defendant VPA.

28.     Defendant Nancy Brooks was, at all relevant times, a Board Member of Defendant VPA and a resident of the State of Colorado.

29.     In her role as Board Member, Defendant Brooks is responsible for adopting and implementing policies for Defendant VPA.

## II.     FACTUAL ALLEGATIONS

**A.     VPA Suspended the Entire Ninth Through Twelfth Grades as a Punishment for Students' Protest Activities**

30.     VPA regularly requires its students to recite a school Pledge of Allegiance.

31.     VPA students typically recite the VPA Pledge of Allegiance on a daily basis.

32.     VPA students typically recite the VPA Pledge of Allegiance at the beginning of school assemblies.

33.     The VPA Pledge of Allegiance reads, "I (state your name) accept the VPA challenge to be a noble knight, and I pledge to do my best for myself, my family, my school, and my community."

34.     In September 2017, many VPA high school students began planning a demonstration to voice their concerns about certain VPA policies and practices.

35.     VPA high school students authored a letter addressed to school officials detailing their concerns.

36.     The student-letter enumerated problem areas identified by the students and included a "list of complaints and questions that we believe summarize how we feel," including:

        a.      "How disciplinary actions are taken."

b.      "Why student's individuality is oppressed?"

c.      "Seniors and Juniors need to be celebrated for academic success."

d.      "A focus needs to be taken on fun just as much as academics."

e.      "Our voices must be heard."

f.      "VPA is proud of our academic history, yet we suffer by not having a 'true high school experience.'"

g.      "VPA has become an award-winning school through the hard work of staff, students, and administration.  However, students receive little to no recognition."

h.      "VPA is known to have a strict set of rules in place, however all the limitation imposed on students has become unbearable."

i.      "Senior year is meant to be memorable but the constant risk of discipline has made it hard to enjoy our last year."

j.      "The Juniors ask for experiences that the seniors have experienced."

37.     The letter concluded, "As the school's leaders, we believe it is our duty to make our school better and make everyone excited to be a VPA graduate . . .  United as the VPA classes of 2018, 2019, 2020, and 2021; we seniors know that change is possible."

38.     On September 28, 2017, Defendant VPA held a mandatory schoolwide assembly before classes began in the gymnasium.

39.     Approximately 120 high school students, grades nine through twelve,

attended the assembly.

40.    During the September 28, 2017 assembly, the student-attendees were instructed to stand and recite the United States Pledge of Allegiance, followed by the VPA Pledge of Allegiance.

41.    The students stood and recited the United States Pledge of Allegiance.

42.    However, when it came time to state the VPA Pledge of Allegiance, many if not all of the students, including Plaintiffs B.F., J.F., M.F., E.F., and V.S., sat down and chose not to recite the school pledge.

43.    Upon the students' refusal to stand for the VPA Pledge of Allegiance, VPA administrators began ordering the students to stand and recite the pledge.

44.    When the students refused to recite the VPA Pledge of Allegiance, administrators sent the assembled students back to their class to begin courses for the day.

45.    Approximately five or ten minutes after the students returned to class, a school administrator used the school's intercom system to instruct all VPA students to return to the gymnasium.

46.    Students, including Plaintiffs B.F., J.F., M.F., E.F., and V.S., returned to the gymnasium.

47.    Defendant Jajdelski and other VPA administrators were waiting in the gymnasium upon the students' return.

48.    Defendant Jajdelski immediately began questioning the students about their protest.

49.     In response, a student representative presented the above referenced letter to Defendant Jajdelski.

50.     Multiple students attempted to answer Defendant Jajdelski's questions, reiterating some of the grievances that had been set forth in the students' open letter.

51.      Defendant Jajdelski grew frustrated with the students' multiple grievances and told the students to call their parents because they were being sent home.

52.     Defendant Jajdelski ordered VPA administrators and staff to call the students' parents and instruct parents that their children were being sent home for the day and that parents needed to come pick their children up.

53.     Over 120 students – the entire ninth through twelfth grades – were thus suspended for the remainder of the school day.

54.     The students who drove themselves to school, including Plaintiff B.F., were sent to the school's main office and then dismissed.

55.     The students who needed to be picked up by their parents waited in the gymnasium until their parents arrived.

56.     As students waited for their parents to arrive, the VPA administration called the Commerce City Police Department.

57.     Officers from the Commerce City Police Department responded to the call.

58.     There were no reports to the Police of violent behavior by any of the students involved in the student-protest.

59.     There were no reports to the Police of threatening behavior by any of the

students involved in the student-protest.

60.     As parents arrived at VPA to collect their children, several asked law enforcement officers for permission to speak with Defendant Jajdelski about why their children were being sent home.

61.     Plaintiffs Mary and Joel Flores were among the parents that sought further clarification from Defendant Jajdelski.

62.     Defendant Jajdelski refused to meet with or speak to any of the parents.

63.     An officer of the Commerce City Police, in response to the parents' request to speak with Defendant Jajdelski, told students and parents "Unfortunately, you can't wait right here . . . Because I'm . . . just going to let you know right now if you . . . don't leave he's going to press charges . . . and then everybody's going to be arrested and taken in."

**B.     VPA Retaliated Against Mary and Joel Flores for Their Coverage of the Student Protest in the Spanish-Language Press**

64.     On September 28, 2017, Plaintiffs Mary and Joel Flores arrived at VPA to pick up their child, E.F.

65.     Plaintiffs Mary and Joel Flores are the owners and editors of *La Prensa De Colorado*, a weekly Spanish-language newspaper.

66.     As students left the VPA campus on September 28, 2017, Plaintiff Mary Flores used her cellphone to film the police arriving at the school as students were being made to leave.  She continued filming from the sidewalk after the police warned students and parents to leave, some students waiting for their parents to come pick them up and police vehicles parked along the road.

67.     Plaintiff Mary Flores also interviewed some students and parents regarding the student protest and VPA's response.

68.     On September 30, 2017, *La Prensa De Colorado* published a front-page article covering the student protest and VPA's dismissal of the entire student body.

69.     The September 30, 2017, article was critical of VPA's response to the student protest and its dismissal of the entire student body and included statements such as:

> a.     "Los papás estan pidiendo una reunión con el director de la escuela, porque no quieren que sus hijos hablen a solas con el director porque es una persona que se altera y les levanta la voz y les grita y esto causa intimidación a los estudiantes."[1]
>
> b.     "También hablamos con algunos padres de familia que compartieron su sentir y desesperación por los malos tratos tanto a los estudiantes como a los papás."[2]

---

[1] English translation: "Parents are requesting a meeting with the school principal, because they don't want their children to speak to the principal alone since he is a person who is easily upset and raises his voice and screams at students, which causes them to be intimidated."

[2] English translation: "We also spoke with a few parents of VPA students who shared their feelings of disappointment with the school's mistreatment of the students as well as the parents."

   c.      "Se convoca a otros papás y estudiantes que han sido victima de

   los malos tratos de esta escuela a que hablen y den su opinión para

   continúr con esta investigación."[3]

70.      On October 6, 2017, VPA gave E.F. a letter and ordered him to deliver it

to Plaintiffs Mary and Joel Flores. That letter included the following statements:

   a.      "On September 28, 2017, school surveillance recorded that in the

   process of our students being released home to their families, you chose

   to detain, film, and photograph Victory Preparatory Academy students

   without school and parent permission."

   b.      "This activity is not only illegal, it is a violation of school policy and

   your family's agreement regarding conduct on school grounds."

   c.      "Your actions created an unsafe situation and required police

   intervention."

   d.      "You also intentionally chose to create a false narrative with

   students, the public, and the media regarding VPA student activities and

   school administration decisions."

   e.      "Your actions on September 28th and the perpetuation of

   information which is false and manipulative regarding Victory Preparatory

   Academy is being reviewed by corporate legal counsel, law enforcement,

   and CLA/VPA Board of Directors."

---

[3] English translation: "We ask that other parents and students who have been victims of the
recent mistreatment by the school reach out and share their opinion in order to help us continue
this investigation."

f.     "Until the review can be completed and processed, you are not permitted on CLA/VPA school properties at any time.  Your only organizational contact during this period will be Nyssa Strom. . . ."

g.     "This notice is also a reminder that CLA/VPA campuses are private property with all legal rights and authority therein.  Failure to comply with this directive will result in law enforcement intervention."

71.     The October 6 letter is signed by the "Community Leadership Academy, Incorporated."

72.     The October 6 letter states that it was cc'd to:

a.     Terry Croy Lewis, Colorado Charter School Institute

b.     Eric Hall, Lewis Roca Rothgerber Christie LLP

c.     Commerce City Police Department

73.     VPA's October 6 letter to Plaintiffs Mary and Joel Flores provides no avenue for challenging or appealing the directives and prohibitions it imposes.

74.     Although it has been well over one year since delivery of this October 6 letter, VPA has never communicated with Plaintiffs Mary and Joel Flores regarding the status of any review, despite asserting in the letter that a review was being undertaken.

75.     VPA never conducted any review as promised in the letter, leaving Plaintiffs Mary and Joel Flores indefinitely barred from school grounds.

76.     As a result of the school grounds restrictions, Plaintiffs Mary and Joel Flores have been unable to attend E.F.'s home sports games or parent-teacher conferences.

77.     As a result of the school grounds restrictions, Plaintiffs Mary and Joel Flores have been unable to pick up or drop off E.F. on school grounds and are forced to pick up or drop off E.F. across or down the street from VPA.

78.     As a result of the school grounds restrictions, Plaintiffs Mary and Joel Flores will be unable to attend E.F.'s graduation from VPA later this year.

79.     As a result of the school grounds restrictions, Plaintiffs Mary and Joel Flores' are not permitted to contact VPA employees involved in E.F.'s education, including E.F.'s teachers.

80.     The restrictions set forth in VPA's October 6, 2017 letter remain in effect today.

81.     VPA did not send the October 6, 2017 letter to Terry Croy Lewis, Colorado Charter School Institute.

82.     VPA did not send the October 6, 2017 letter to Eric Hall, Lewis Roca Rothgerber Christie LLP.

83.     VPA did not send the October 6, 2017 letter to the Commerce City Police Department.

84.     Defendant Board Members unanimously voted to approve VPA barring Plaintiffs Mary and Joel Flores from school grounds.

**C.     VPA Retaliated Against Students Who Spoke to the Press or on Social Media about the Student Protests**

   i.     <u>VPA Expelled B.F. and Her Siblings from VPA</u>

85.     Following the events of September 28, 2017, VPA took punitive measures against students who had spoken to the media regarding the student protests or had posted messages critical of VPA on social media.

86.     After the student protests, Plaintiff B.F. posted a message on Facebook which read in pertinent part, "If you go to VPA, don't say the school pledge tomorrow. Sit down and link arms to show we are united.  Let's keep this up."

87.     Plaintiff B.F. also posted a message on Facebook which read, "Proud of the high school VPA Knights. A step towards change."

88.     Plaintiff B.F. also participated in *La Prensa's* media coverage following the students' suspension by interviewing with Mary Flores.

89.     Plaintiff B.F. was quoted in the September 30, 2017 *La Prensa* article discussed above.

90.     The September 30 *La Prensa* article quoted B.F. as stating: ""Nos rehusamos a levantarnos y ellos [la administración escolar], nos empezaron a gritar y decir '¡Levántense! ¡Todos levántense!'"[4]

91.     The day after the student protests, September 29, 2017, Defendant Jajdelski called B.F.'s two younger siblings, both of whom were enrolled in VPA's sister

---

[4] English translation: "We refused to stand and they [the administration] yelled at us and told us 'Get up! Everyone get up!'"

middle school, Community Leadership Academy ("CLA"), into a meeting. This meeting occurred outside the presence of B.F.'s parents.

92.    Principal Jeremey Hanson was also present at this meeting.

93.    Defendant Jajdelski questioned B.F.'s younger siblings about their desire to remain at VPA.

94.    B.F.'s siblings had not participated in the student protests, as they did not attend VPA.

95.    Defendant Jajdelski told B.F.'s siblings that their conduct implied that they did not want to attend to CLA/VPA.

96.    On October 2, 2017, B.F. and her younger brother and sister were again called to a meeting with Defendant Jajdelski.

97.    VPA administrator Wade Cole was also present at the October 2, 2017 meeting.

98.    Defendant Jajdelski accused B.F. of being a "ringleader" in the student protests.

99.    At this meeting, B.F. reiterated why she and the other VPA high school students had felt the need to air their grievances.

100.    Defendant Jajdelski, referring to B.F.'s Facebook posts quoted above, accused B.F. of cyberbullying and intimidating other students into joining the September 28, 2017 protest.

101.    Defendant Jajdelski then told B.F. and her siblings that they needed to decide whether they wanted to remain at VPA.

102.   B.F. and her siblings attempted to leave the meeting but were told by Defendant Jajdelski to "park it."

103.   Defendant Jajdelski informed B.F. that their father had been asked to come in for a meeting.

104.   Neither Defendant Jajdelski or Wade Cole speak Spanish fluently.

105.   They brought in another staff person to interpret and translate during their meeting with B.F.'s father.

106.   When B.F.'s father arrived, Defendant Jajdelski told him that B.F. "is in the middle of a bunch of mess that absolutely is not acceptable and, you know what, it was completely unnecessary."

107.   Wade Cole asked B.F.'s father, "Have you seen what she's participating in online?"

108.   Defendant Jajdelski then asked B.F.'s father the same question.

109.   B.F.'s father asked Defendants Jajdelski and Cole if they were referring to "something bad."

110.   Wade Cole responded, "I don't feel like it's a healthy message for the school."

111.   Defendant Jajdelski then told B.F.'s father that he needed to withdraw his children from CLA/VPA or they would be expelled.

112.   Defendant Jajdelski and Cole then presented B.F.'s father with enrollment withdrawal paperwork, which they had already drawn up.

113.    Upon Defendant Jajdelski's insistence, B.F.'s father executed the withdrawal paperwork, effectively expelling B.F. and her siblings from VPA.

114.    VPA typically removes students from the school by forcing parents to execute withdrawal paperwork, rather than directly expelling a student.

115.    VPA's handbook includes the following provision, directed toward parents: "I further understand and consent to my parental responsibilities as outlined in this handbook; including the agreement to immediately activate the signed consent to voluntarily withdraw my student(s) if I or any family member displays inappropriate conduct directed at the school or school personnel on or off school property."

        ii.    <u>VPA Expelled V.S.</u>

116.    V.S., like the other Student-Plaintiffs, participated in the September 28, 2017 protest.

117.    Following the protest, Plaintiff V.S. was featured prominently in a local televised news segment on Denver 7 News covering the student protests and suspensions.

118.    Plaintiff V.S. stated in a televised interview to Denver 7 News, "That was the point, to be heard. I mean – that we want to make a difference."

119.    On September 29, 2017, another VPA student posted a Facebook message critical of Defendant Jajdelski's decision to suspend the entire high school student body the day before. The post indicated that Defendant Jajdelski could suck the student's left nut.

120.    V.S. shared the other student's post on his own Facebook page and

added similar comments about Defendant Jajdelski.

121.    On or about September 29, 2018, Defendant Jajdelski called V.S. to a meeting.

122.    During the meeting, Defendant Jajdelski showed V.S. screenshots of the Facebook posts.

123.    Defendant Jajdelski then demanded that V.S. hand over his cellphone to Defendant Jajdelski. V.S. refused.

124.    V.S. apologized to Defendant Jajdelski for the Facebook posts.

125.    Defendant Jajdelski told V.S. that he had already decided to expel V.S. from VPA and that V.S.'s mother had been contacted and asked to come to the school.

126.    While waiting for his mother to arrive, V.S. left the office and went to the restroom.

127.    While V.S. was inside the restroom, Defendant Jajdelski contacted the Commerce City Police Department.

128.    Police officers responded and arrived at the school.  When they arrived and discovered why they had been called, they refused to take any action against V.S. and left the school.

129.     When V.S.'s mother arrived at the school, Defendants Jajdelski presented her with mandatory enrollment withdrawal paperwork for V.S. and demanded, through the use of an interpreter, that V.S.'s mother sign the paperwork to disenroll V.S. from VPA.

130.    V.S.'s mother, through the assistance of a translator, asked Defendant

Jajdelski to allow V.S. to remain at VPA.

131.   V.S.'s mother also requested that alternative punishments could be imposed short of expulsion.

132.   Defendant Jajdelski refused to consider any discipline short of expulsion. V.S.'s mother was compelled to sign the paperwork withdrawing V.S. from school.

133.   Ultimately, multiple other students were suspended or expelled from VPA for having "liked," shared, or commented on the Facebook post critical of Defendant Jajdelski.

**D.    VPA's Unconstitutional Student Handbook**

134.   VPA employs a 66-page "Parent/Student Handbook" ("VPA Handbook") to establish policies that govern both student and parent conduct in relation to the school.

135.   VPA charges students and parents five dollars for a copy of the VPA Handbook.

136.   According to VPA's website, 90% of VPA students qualify for free/reduced priced meals.

137.   VPA does not provide a Spanish-language version of the VPA Handbook.

138.   According to VPA's website, 94% of the student body is Hispanic. 75% of VPA students are considered "English Language Learners."

139.   Many parents, including the parents of Student-Plaintiffs B.F., V.S., M.F. and J.F., are monolingual Spanish-speakers.

140.   The prefatory language on the first page of the VPA Handbook reads:

VPA is a community characterized by the spirit and practice of Excellence, Character, Nobility, Vision and Valor. Every member of the community has

the right to expect a professional, safe, respectful, clean, and welcoming environment. Everyone must cooperate to fulfill this expectation.

Inappropriate behaviors are NOT tolerated.

**IF PARENTS OR COMMUNITY MEMBERS THREATEN THE SCHOOL AND OR STAFF (I.E., USE PROFANITY, SHOUT, USE PHYSICAL OR VERBAL INTIMIDATION, REFUSE TO LEAVE SCHOOL GROUNDS, MAKE DEMANDS, ETC.,) THE SCHOOL IS NOT OBLIGATED TO MEET OR FURTHER COMMUNICATE IN ANY WAY. THIS BEHAVIOR IS CONTRARY TO THE SCHOOL'S POLICIES AND ENROLLMENT AGREEMENT. THE ENROLLMENT OF STUDENT(S) IN RELATION TO THE PARENT/COMMUNITY MEMBER DEMONSTRATING UNACCEPTABLE BEHAVIOR WILL BE JEOPARDIZED.**

Students, parents, community members and visitors should be respectful at all times of the property and privacy of VPA's neighborhood residents. Smoking, littering, graffiti, and noise pollution are prohibited in the neighborhood.

Persons meetings students after the school or attending school events or activities should be advised by student/parents that any disrespectful behaviors are prohibited.

141.    The VPA Handbook requires that "students and parents/guardians must always be mindful that continued enrollment in this school includes compliance with agreed upon expectations for behavior, participation, and outcomes and responsibilities regarding conduct, both inside and outside the classroom and school. VPA students are expected to conduct themselves in such a manner as to be a credit to themselves and to their school."

142.    To the extent that the VPA Handbook mentions internet use, it applies only to in-school use.  The Handbook states:

Students are prohibited from accessing the Internet without a signed permission form; parents and students are required to sign a form and accept responsibilities and consequences contained therein. VPA intends that students will use the Internet only for appropriate, school-related applications and reserves the right to prohibit students from its use should non-school or unacceptable uses be detected.

143.    The VPA Handbook also includes a policy stating that VPA "reserves the right to discipline students for conduct that occurs both on or off school grounds which is deemed detrimental to the reputation or culture of the school."

144.    Both students and parents are obligated to sign an acknowledgment of the VPA Handbook, including a promise by parents "to immediately activate the signed consent to voluntarily withdraw my student(s) if I or any family member displays inappropriate conduct directed at the school or school personnel on or off school property (i.e., harassment, cursing, intimidation, defamation, obstinate or demanding actions, etc.)."

145.    The VPA Handbook does not provide any form of hearing, conference, or appeal process for student expulsions.  The VPA Handbook also contains policies separate from those governing student discipline concerning "complaints by members of the public concerning school personnel."

146.    That VPA public complaint policy provides:

The Academy trusts, values, and supports its employees and seeks to protect them against unwarranted and unnecessary attacks.  Therefore, all formal complaints by members of the public concerning school personnel shall be in writing and bear the signature of the concerned party.  Anyone who defames a CLA/VPA employee and damages a person's professional reputation, whether before students or any third party, may be subject to legal action brought by the employee.

147.    The community member complaint policy further imposes:

a.      An "Initial Communication" phase, providing that members of the public "must first try to resolve the matter directly and informally with the staff member concerned.";

b.      A "Review" phase, providing that upon failure of the "Initial
Communication" stage, "the concerned party may submit a written
grievance describing his/her concerns . . . A written grievance must be
submitted within five (5) school days of the act on which the complaint is
based.  If not so presented, the complaint will not be recognized and shall
be considered waived.";

c.      An "Appeal" phase, providing that upon failure of the "Review"
phase a complainant "may submit a written appeal within five (5) school
days to the Chief Executive Officer."

d.      An "Appeal to the Board of Directors" phase, providing that upon
failure of the "Appeal" phase, a complainant may, "submit a written appeal
within five (5) school days to the Board of Directors.  The Board has the
discretion to accept or reject the Chief Executive Officer's resolution of the
issue."

e.      Finally, in the event "the concerned party is not satisfied with the
Board of Director's decision to accept the Chief Executive Officer's
resolution or the result of the Board of Director's investigation, the
concerned part may submit its concerns in written format to the school's
authorizer, the Colorado Charter School Institute, within five (5) business
days . . . The decision of the school's Board of Directors will not be
overturned unless there are compelling grounds that the school violated
an applicable law, regulation, policy, or contract provision."

148.    The VPA Handbook states only that a student will be "informed of the consequences" of his or her actions if he or she is suspended, and that the "Administration will set up a conference with the parents or guardians to discuss ways to rectify violations."

### III.    CLASS ACTION ALLEGATIONS

149.    Plaintiffs B.F., E.F., V.S., M.F., and J.F. bring the causes of action identified below on behalf of themselves and all other similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek injunctive and declaratory relief, and damages, applicable to the members of the class as defined below.

150.    Plaintiffs bring this action on behalf of all persons who were suspended by VPA on September 28, 2017.

151.    Plaintiffs also bring this action on behalf of all persons who were suspended or expelled due to Facebook and other social media activity relating to the protests on September 28, 2017.

152.    Class action status for the Plaintiffs in this litigation is proper because:

a.      The class of aggrieved students and former students is so numerous that joinder of all members is impractical. Upon information and belief, VPA's high school student body contains approximately 120 students each year.

b.      There are questions of law and fact common to the class, including whether VPA suspended its entire student body in violation of their First Amendment protected right to protest; whether VPA suspended and

24

expelled students for their out-of-school social media activity in violation of their First Amendment rights; whether VPA retaliated against students based on their First Amendment protected activity; and whether VPA expelled, suspended, or otherwise disciplined students without due process of law;

c.      Plaintiffs' claims are typical of the claims of the class in that each Plaintiff is either a current or former student of VPA who has been subjected to a constitutional deprivation related to their Free Speech and/or Due Process rights, and currently has claims that, like the claims of the class, arise from the same policies, practices, and procedures, created, maintained, and enforced by Defendants.

d.      Plaintiffs and all class members have been similarly affected by Defendants' common course of conduct;

e.      Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between the named Plaintiffs and the other class members; and

f.      Plaintiffs can adequately represent the interests of the class members and have retained counsel experienced in constitutional litigation.

g.      Defendants have acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate respecting the class as a whole.

## IV.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First and Fourteenth Amendments – Protest-Based School Suspensions**
**(Plaintiffs B.F., E.F., V.S., M.F., J.F., and a Class of Similarly-Situated Students**
**Against Defendants Jajdelski and VPA)**

153.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

154.    Defendants were acting under color of state law in their actions and inactions at all times relevant to this action.

155.    Plaintiffs B.F., E.F., V.S., M.F., J.F., and similarly-situated students (collectively "Student-Plaintiffs") had a constitutionally protected and clearly established right to be free from government compelled speech.

156.    Student-Plaintiffs had a constitutionally protected and clearly established right to refrain from reciting the VPA Pledge of Allegiance.

157.    Defendants violated Student-Plaintiffs' First Amendment rights by forcing Student-Plaintiffs and their similarly situated peers to recite the VPA Pledge-of-Allegiance on September 28, 2017, when Student-Plaintiffs declined to recite the VPA Pledge of Allegiance as a form of protest.

158.    Students in public schools have a clearly-established right to engage in political speech and protest at school, provided that the speech does not cause any material disruption to the educational environment.

159.    The September 28, 2017 student protest was a form of speech that is protected by the First Amendment.

160.   The September 28, 2017 student protest did not cause any material disruption to education at VPA or substantially interfere with the work of the school.

161.   Defendants violated Student-Plaintiffs' First Amendment right to free speech and expression by suspending Student-Plaintiffs because of their political protest, and without a legitimate pedagogical justification.

162.   Defendant Jajdelski had final policymaking authority from Defendant VPA concerning the discipline and punishment of VPA students, including Student-Plaintiffs.

163.   When Defendant Jajdelski suspended the entire VPA student body, including Student-Plaintiffs, he was acting as a final policymaker for Defendant VPA.

164.   Defendant Jajdelski was a final policymaker for Defendant VPA regarding its decision to require Student-Plaintiffs to recite the VPA Pledge of Allegiance on September 28, 2017.

165.   Defendant Jajdelski's actions deprived Student-Plaintiffs, and a class of similarly situated students, of their federally protected First Amendment rights.

166.   A direct causal link exists between Defendants' decision to compel the VPA Pledge of Allegiance and the injuries alleged.

167.   Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Students-Plaintiffs' federally protected rights.

168.   Defendants' conduct violated clearly established rights belonging to the Plaintiffs of which reasonable school officials knew or should have known.

169.    Plaintiffs were and continue to be damaged by Defendants' violation of

their First Amendment rights.

170.    As a direct result of Defendants' unlawful actions as described above,

Student-Plaintiffs suffered actual economic and emotional injuries, in an amount to be

proven at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Retaliation – Protest-Based School Suspensions**
(**Plaintiffs B.F., E.F., V.S., M.F., J.F. and a Class of Similarly-Situated Students**
**Against Defendants Jajdelski and VPA**)

171.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if

fully set forth herein.

172.    Student-Plaintiffs engaged in constitutionally protected activity when they

engaged in peaceful protest of VPA.

173.    As a result of Student-Plaintiffs' constitutionally protected protest,

Defendants suspended VPA's entire student body.

174.    Defendants' actions against Student-Plaintiffs would chill a person of

ordinary firmness from continuing to engage in constitutionally protected protest.

175.    Defendants' actions were substantially motivated as a response to the

Student-Plaintiffs' exercise of constitutionally protected rights.

176.    Defendant Jajdelski had final policymaking authority from Defendant VPA

concerning the discipline and punishment of VPA students, including Student-Plaintiffs.

177.   When Defendant Jajdelski suspended the entirety of the VPA student body, including Student-Plaintiffs, he was acting as a final policymaker for Defendant VPA.

178.   Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Student-Plaintiffs' federally protected rights.

179.   Defendants' conduct violated clearly established rights belonging to Student-Plaintiffs of which a reasonable school official knew or should have known.

180.   Student-Plaintiffs were and continue to be damaged Defendants' violation of their First Amendment rights.

181.   As a direct result of Defendants' unlawful actions as described above, Student-Plaintiffs suffered actual economic and emotional injuries, in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First and Fourteenth Amendments – Suspensions and Expulsions for Use of Social Media to Protest**
(**Plaintiffs B.F., V.S., and a Class of Similarly-Situated Students Against Defendants Jajdelski and VPA**)

182.   Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

183.   Defendants were acting under color of state law in their actions and inactions at all relevant times.

184.    By suspending or expelling B.F., V.S., and similarly-situated students from VPA for using social media to express criticism of the school and its administrators, Defendants violated their First and Fourteenth Amendment rights.

185.    VPA's Handbook does not address students' outside-of-school use of the internet and social media.

186.     B.F. and V.S. retain the right to engage in political speech and protest outside of school on social media without fear of school-based disciplinary reprisal.

187.    Defendants violated B.F.'s right to free speech and expression under the First Amendment when they forced B.F. and her younger siblings to withdraw from VPA for having made statements in support of the September 28, 2017 student protest on her Facebook page.

188.    Defendants violated V.S.'s right to free speech and expression under the First Amendment when they expelled V.S. from VPA for having "liked" and "shared" another student's Facebook criticizing Defendant Jajdelski, and for making additional statements critical of Defendant Jajdelski on Facebook.

189.    Defendant Jajdelski had final policymaking authority from Defendant VPA concerning the discipline and punishment of VPA students, including B.F. and V.S..

190.    When Defendant Jajdelski punished Plaintiffs B.F., V.S., and other students for engaging in First Amendment protected speech, he was acting as a final policymaker for Defendant VPA.

191.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiffs B.F.'s and V.S.'s federally protected rights.

192.    Defendants' conduct violated clearly established rights belonging to Plaintiffs B.F. and V.S. of which a reasonable school official knew or should have known.

193.    Plaintiffs B.F. and V.S. were and continue to be damaged by Defendants' violation of their First Amendment rights.

194.    As a direct result of Defendants' unlawful actions as described above, Plaintiffs B.F. and V.S. have suffered actual emotional and economic injuries, in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Retaliation – Prohibition from School Property**
**(Plaintiffs Mary and Joel Flores Against Defendants Jajdelski, VPA, and**
**Defendant Board Members)**

195.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

196.    Defendants were acting under color of state law in their actions and inactions at all times relevant to this action.

197.    By their actions and inactions described herein, Defendants deprived Plaintiffs Mary and Joel Flores of their federally-protected rights under the First and Fourteenth Amendments.

198.    Plaintiffs Mary and Joel Flores were engaged in constitutionally protected activity when they interviewed and recorded students following the September 28, 2017 student protest.

199.    Plaintiffs Mary and Joel Flores additionally possessed a right under the First Amendment to the Constitution to report about events taking place at VPA in *La Prensa*, without fear of retaliation by Defendants.

200.    As a result of Plaintiffs Mary and Joel Flores constitutionally protected newsgathering activity, Defendants banned Plaintiffs Mary and Joel Flores from all VPA property and threatened them with civil action and criminal prosecution.

201.    Defendants' retaliation against Mary and Joel Flores for their news reporting activities would chill a person of ordinary firmness from continuing to engage in constitutionally protected newsgathering activity.

202.    Defendants' actions were substantially motivated as a response to the Plaintiffs' exercise of their constitutionally protected right to newsgather and report.

203.    VPA's October 6, 2017 letter invokes the threat of civil and criminal prosecution against Plaintiffs Mary and Joel Flores and falsely claims to have cc'd a civil attorney and the Commerce City Police Department.

204.    When Defendant Jajdelski barred Plaintiffs Mary and Joel Flores from the VPA campus and threatened them with additional sanctions based on their First Amendment protected speech, he was acting as a final policymaker for Defendant VPA.

205.    The Board of Directors for VPA, including Defendants Smith, DeLaCruz, Montano, Clinkinbeard, Reed, Seay, and Brooks, discussed punishment for Plaintiffs Mary and Joel Flores at a Board meeting.

206.    Defendants Smith, DeLaCruz, Montano, Clinkinbeard, Reed, Seay, and Brooks unanimously voted to prohibit Mary and Joel Flores from setting foot on school grounds or contacting VPA staff directly regarding E.F.'s education.

207.    Defendants Smith, DeLaCruz, Montano, Clinkinbeard, Reed, Seay, and Brooks unanimously voted to issue the October 6, 2017 letter to Plaintiffs Mary and Joel Flores, indefinitely precluding them from setting foot on school grounds or contacting VPA staff regarding E.F.'s education.

208.    By doing so, Defendants Smith, DeLaCruz, Montano, Clinkinbeard, Reed, Seay, and Brooks ratified Defendant Jajdelski's decision to indefinitely bar Plaintiffs Mary and Joel Flores from setting foot on school grounds or contacting VPA staff regarding E.F.'s education.

209.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiffs' federally protected rights.

210.     Defendants' conduct violated clearly established rights belonging to the Plaintiffs of which a reasonable school official knew or should have known.

211.    Plaintiffs were and continue to be damaged Defendants' violation of their First Amendment rights as they remain barred from school grounds.

212.    As a direct result of Defendants' unlawful actions as described above, Plaintiffs suffered actual economic and emotional injuries, in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Procedural Due Process**
**(All Plaintiffs and a Similarly-Situated Class of Students Against All Defendants)**

213.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

214.    Defendants were acting under color of state law in their actions and inactions at all times relevant to this action.

215.    By their actions and inactions described herein, Defendants subjected Plaintiffs to the deprivation of their rights under the Fourteenth Amendment.

216.    Specifically, students in public schools are entitled to procedural due process under the Fourteenth Amendment before suspension or expulsion from school.

217.    Under the Fourteenth Amendment, Student-Plaintiffs and other similarly-situated students were entitled to notice of the charges against them and a fair hearing to plead their cases prior to being suspended, expelled, and/or forced to withdraw.

218.    Student-Plaintiffs did not receive notice of the charges against them, a fair hearing, or any process whatsoever prior to being suspended, expelled, and/or forced to withdraw from Defendant VPA.

219.    Student-Plaintiffs had no avenue or appeal process by which to challenge their suspensions, expulsions, and/or forced withdrawals from Defendant VPA.

220.    VPA policies and procedures, including those found in the Handbook described above, serve as the basis for discipline, but are written so vaguely and broadly that students and parents receive inadequate notice of what conduct may result in an offense.

221.    VPA's policies and procedures as described above are unconstitutionally overbroad because they provide school officials with unbridled discretion to discipline students, up to and including suspension and expulsion, without limitation, objective criteria, or any due process.

222.    VPA's policies and procedures are unconstitutionally overbroad because the language in the Handbook is ambiguous and criteria for discipline are entirely subjective, such that countless constitutionally protected activities may fall within the permitted zone of discipline.

223.    VPA's policies and procedures are unconstitutionally vague because they do not allow a person of ordinary intelligence to determine what conduct the policies prohibit, and because the policies authorize arbitrary and overzealous enforcement.

224.    Defendant Board Members Smith, DeLaCruz, Montano, Clinkinbeard, Reed, Seay, and Brooks approved and/or ratified Defendant VPA's unconstitutionally vague and overbroad policies.

225.    Likewise, parents of public-school students are entitled to procedural due process under the Fourteenth Amendment before they can be barred from school grounds.

226.    Plaintiffs Mary and Joel Flores possess a right to procedural due process under the Fourteenth Amendment prior to the imposition of indefinite physical exclusion from all VPA property.

227.    Plaintiffs Mary and Joel Flores did not receive adequate notice of the charges against them, a fair hearing, or any process whatsoever prior to being indefinitely deprived of access to school grounds and all of the benefits and privileges that attend such access.

228.    Plaintiffs Mary and Joel Flores had no avenue or appeal process by which to challenge their indefinite exclusion from school grounds. Rather, Plaintiffs Mary and Joel Flores were told that the school would conduct an investigation into their conduct and that they would be barred from school grounds until that investigation concluded. Over a year later, they have not received the results of any investigation and their exclusion from school grounds remains in effect.

229.    When Mr. Jajdelski prohibited Mary and Joel Flores from VPA grounds, and threatened them with additional civil and criminal sanctions, he was acting as a final policymaker for Defendant VPA.

230.    Board Member Defendants approved and/or ratified the acts of Defendant Jajdelski in indefinitely banning Mary and Joel Flores from VPA's school grounds.

231.    The Board Member Defendants knew of and specifically made a deliberate choice to approve of Defendant Jajdelski's actions and the basis for those actions.

232. The Board Member Defendants' continue to decline to allow Mary and Joel Flores access to school grounds.

233. Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiffs' federally protected rights.

234. Defendants' conduct violated clearly established rights belonging to the Plaintiffs of which a reasonable school official knew or should have known.

235. Plaintiffs were and continue to be damaged by Defendants' violation of their First Amendment rights as they remain unable to return to campus.

236. As a direct result of Defendants' unlawful actions as described above, Plaintiffs suffered actual economic and emotional injuries, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

a. A declaration that Defendants have violated Plaintiffs' First and Fourteenth Amendment rights under the United States Constitution;

b. Issuance of an injunction prohibiting Defendants and their agents from enforcing Defendant VPA's unconstitutionally vague and overbroad policies;

c.      Issuance of an injunction rescinding the punitive measures against Plaintiffs Mary and Joel Flores for exercising their First Amendment rights to newsgather and publish information in their newspaper;

d.      All appropriate equitable relief including changes to Defendants' policies concerning on-and-off-campus speech, discipline, and enrollment, and other declaratory and injunctive remedies, as appropriate;

e.      Actual economic damages as established at trial;

f.      Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

g.      Punitive and/or liquidated damages for all claims allowed by law in an amount to be determined at trial;

h.      Pre-judgment and post-judgment interest at the highest lawful rate;

i.      A tax offset for any damages award;

j.      Attorneys' fees and costs; and

k.      Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: November 13, 2018

RATHOD | MOHAMEDBHAI LLC

*s/ Nicholas A. Lutz*
Nicholas A. Lutz
Iris Halpern
Matthew J. Cron
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
nl@rmlawyers.com
ih@rmlawyers.com
mc@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS