## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-02916-RM-SKC

MARY FLORES, individually and on behalf of E.F., a minor child;
JOEL FLORES, individually and on behalf of E.F., a minor child;
BERTHA CEJA on behalf of V.S., a minor child;
MARIA CASTANEDA on behalf of M.F. and J.F., minor children;
B.F., an individual, on behalf of herself and those similarly-situated;
JOHN DOES 1-150, minor children;

       Plaintiffs,

v.

VICTORY PREPARATORY ACADEMY, a governmental entity;
RON JAJDELSKI, in his individual and official capacities;
JEFF SMITH, in his individual and official capacities;
CAMIL DELACRUZ, in her individual and official capacities;
ROSALIE MONTANO, in her individual and official capacities;
NORMA CLINKINBEARD, in her individual and official capacities;
JEFF REED, in his individual and official capacities;
JAMES SEAY, in his individual and official capacities;
NANCY BROOKS, in her individual and official capacities;
JOHN DOES 1-10, in their individual and official capacities;

       Defendants.

---

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

On September 28, 2017, desiring more input into their educational experiences, students at Victory Preparatory Academy ("VPA") staged a peaceful protest by refusing to recite the "school spirit pledge." In response, VPA's administration suspended the entire student body – approximately 120 students – for the remainder of the day. In the days following, VPA suspended or expelled numerous students who posted about the protest and its fallout on social media.

As a result of those and other related events, Plaintiffs E.F., V.S., M.F., J.F., and B.F.

("Student Plaintiffs") have filed a class-action lawsuit seeking relief on behalf of themselves and a class of similarly-situated students.[1] [ECF No. 1]. The parents of E.F., Mary and Joel Flores ("Flores parents"), have also brought First and Fourteenth Amendment claims after VPA indefinitely barred them from school grounds for covering the student protests in their Spanish-language newspaper, *La Prensa de Colorado*.

Although Plaintiffs bring other First and Fourteenth Amendment claims based on the school's actions on September 28, 2017, and immediately thereafter, not all those claims are appropriate for preliminary injunctive relief. [*See* ECF No. 1 at ¶¶ 153-236 (statement of claims)]. This Motion for Preliminary Injunction seeks two forms of relief. First, Defendants have exploited unconstitutionally overbroad and vague written student handbook policies to justify their actions, including policies that permit administrators to discipline and even expel students for any speech they disagree with or dislike without notice or a right to a fair hearing or appeal. Until a final decision can be rendered on the merits of this case, Plaintiffs move for a preliminary injunction enjoining Defendants from enforcing these unconstitutional policies. Second, Plaintiffs also move for a preliminary injunction requiring Defendants to allow the Flores parents back onto VPA grounds so that they can participate in their son's education in his final high school semester.

<u>**RELEVANT FACTS**</u>

**I.      The Student Protests of September 28, 2017.**

By way of background, on September 28, 2017, Student Plaintiffs and other high school students at VPA organized a peaceful protest to request more say in their educational experience.

---

[1] In Colorado, charter schools are treated like all other public schools for purposes of Constitutional violations. *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192 (2007) (reversing summary judgment for employer charter school on teachers' freedom of speech and freedom of association claims); *see* Dep't of Educ., https://www.cde.state.co.us/cdechart (last visited Dec. 7, 2018).

At approximately 8:30 a.m. that morning, at a student assembly in the gymnasium, students stood and recited the national pledge of allegiance. After completing the national pledge, students were asked by teachers and administrators to remain standing and recite the VPA "school spirit pledge." [ECF No. 1 at ¶¶ 42-45]. That pledge requires students to recite the following: "I (state your name) accept the VPA challenge to be a noble knight, and I pledge to do my best for myself, my family, my school, and my community." [ECF No. 1 at ¶ 33]. In protest, almost none of the high school students stood for the pledge. [*Id.* at ¶¶ 30-45].

Prior to the protest, students had collaborated on a written petition describing their concerns and suggesting reforms. [**Ex. 1**, *Student Petition*]. In the petition, students questioned "how disciplinary actions are taken" and "[w]hy Student's individuality is oppressed?" [*Id.*]. The student petition explained that, "we believe it is our duty to make our school better and make everyone excited to be a VPA graduate." *Id.* The students asked that they be recognized not only for their academic successes, but that the school include more fun activities typical of the "high school experience," and loosen some of the "strict rules in place" which students felt had become "unbearable" because of the constant threat of discipline. [*Id.*].

Before the students had an opportunity to present administrators with their petition, they were instructed to return to class. Ten minutes later Wade Cole, VPA's Activities Administrator, ordered all high school students to return to the gymnasium over the intercom system. [ECF No. 1, at ¶¶ 46-47]. Defendant Ronald Jajdelski was waiting for the students when they returned. He demanded more information about the protest and a student representative handed Defendant Jajdelski a copy of the student petition. [*See* **Ex. 1**]. After arguing with several students about their grievances, Defendant Jajdelski told the entire student body that he was sending them home, and then ordered administrators to call the students' parents. [ECF No. 1, at ¶¶ 51-52].

**II.      VPA Retaliates Against the Flores Parents for Press Coverage of the Protest.**

Joel and Mary Flores were among the parents called to VPA to pick up their child, E.F., on September 28th. They are also the publishers of *La Prensa de Colorado*, a community Spanish-language newspaper with a weekly circulation of about 10,000. When the Flores parents arrived at VPA to pick up E.F., they and other guardians were met by the police.

Since Joel and Mary Flores are both bilingual,[2] they and a few other bilingual parents served as representatives on behalf of a larger group of parents requesting to speak with school administrators. [**Ex. 2**, *Sept. 28, 2017 Transcript*, 2:6-5:10; **Ex. 3**, video footage with police, September 28, 2017) (to be manually submitted)]. The police officers informed students and parents that if they did not all leave school grounds immediately, Defendant Jajdelski would press charges against them and have them arrested. [*Id.* at 5:13-25]. The Flores parents then left the property. When the police first arrived, and again after leaving the property, Mary Flores interviewed several students and took cell phone video footage of the police, as well as parents coming to pick up their children in the parking lot. [**Ex. 4**, *Decl. of Mary Flores*, at ¶ 4; **Ex. 5, 6** off-premises video footage, September 28, 2017) (to be manually submitted)].

A few days later, on September 30, 2017, the Flores parents ran a multi-page article in *La Prensa* about the student protest and mass suspension, which included photos of the chaotic scene as parents arrived en masse to pick up their children. [**Ex. 7**, *La Prensa Article*]. The article was critical of VPA's actions, reporting that students had been respectful in their protest and written demands, and that students were victims of the administration's punitive response. [*Id.* at 3].

On October 6, 2017, VPA sent E.F. home with a letter addressed to Joel and Mary Flores. The letter prohibited them from approaching school property on the grounds that, *inter alia*, they

---

[2] Over ninety percent of VPA's student body is Hispanic or Latinx, and many parents are monolingual.

*"intentionally chose to create a false narrative with students, the public, and the media regarding the VPA student activities and school administration decisions."* [**Ex. 8**, *October 6, 2017 Letter to Joel and Mary Flores* (emphasis added)]. The letter also claimed that both Flores parents detained, filmed, and photographed students without school and parent permission which "create[ed]" an "unsafe situation [that] required police intervention," even though VPA had called the police long before the Flores parents arrived on school grounds, ostensibly to report some improperly parked cars. [*See* **Ex. 2, 3**; **Ex. 9**, *Dispatch Log*]. The letter then threatened Joel and Mary Flores with legal action and criminal charges because of their *"perpetuation of information which is false and manipulative regarding Victory Preparatory Academy."* [**Ex. 8** (emphasis added)]. The letter suggests that the Flores parent's actions were *"being reviewed by corporate legal counsel, law enforcement, and [the] CLA/VPA Board of Directors."* *Id.* (emphasis added). The letter then warns the Flores parents that they will be arrested if they approached school grounds until the school completed its "review" of their actions. *Id.* VPA provided no grounds for challenging or appealing the school's decision, and the Flores parents have never received the results of any alleged review. To date, the Flores parents are still barred from setting foot on VPA premises, on the threat of arrest and civil legal action. Unless an injunction is granted, they will miss E.F.'s final parent-teacher conferences, last sports events, and even his graduation.

## III.     VPA's Unconstitutional Student Handbook.

In the days after the protest and mass-suspension, VPA suspended or expelled numerous students for posting on Facebook about the protest and/or the school's response. VPA undertook these disciplinary actions pursuant to its 66-page handbook which is only available in English even though most parents and guardians of VPA students are either monolingual Spanish-speakers or speak English as a second language. *See* **Ex. 10**, *Student Handbook*. The handbook prohibits

students from taking photographs of other students at school without permission but is silent about photography with respect to parents or the press, other than prohibiting covert or secret recordings more generally. *Id.* at 10, 24. The rule book has prefatory language on the first page that states:

> VPA is a community characterized by the spirit and practice of Excellence, Character, Nobility, Vision and Valor. Every member of the community has the right to expect a professional, safe, respectful, clean, and welcoming environment. Everyone must cooperate to fulfill this expectation.

> Inappropriate behaviors are NOT tolerated.

> **IF PARENTS OR COMMUNITY MEMBERS THREATEN THE SCHOOL AND OR STAFF (I.E., USE PROFANITY, SHOUT, USE PHYSICAL OR VERBAL INTIMIDATION, REFUSE TO LEAVE SCHOOL GROUNDS, MAKE DEMANDS, ETC.,) THE SCHOOL IS NOT OBLIGATED TO MEET OR FURTHER COMMUNICATE IN ANY WAY. THIS BEHAVIOR IS CONTRARY TO THE SCHOOL'S POLICIES AND ENROLLMENT AGREEMENT. THE ENROLLMENT OF STUDENT(S) IN RELATION TO THE PARENT/COMMUNITY MEMBER DEMONSTRATING UNACCEPTABLE BEHAVIOR WILL BE JEOPARDIZED.**

> Students, parents, community members and visitors should be respectful at all times of the property and privacy of VPA's neighborhood residents. Smoking, littering, graffiti, and noise pollution are prohibited in the neighborhood.

> Persons meetings students after the school or attending school events or activities should be advised by student/parents that any disrespectful behaviors are prohibited.

*Id.* at 2 (emphasis in original). The handbook further mandates that "students and parents/guardians must always be mindful that continued enrollment in this school includes compliance with agreed upon expectations for behavior, participation, and outcomes and responsibilities regarding conduct, both inside and outside the classroom and school. VPA students are expected to conduct themselves in such a manner as to be a credit to themselves and to their school" and that "[v]ulgarities, obscenities, cursing, other forms of 'street language,' or negative tones are both offensive and contrary to our educational environment." *Id.* at 6-7. The handbook makes no specific mention of students' use of social media or the internet outside of school. To the extent that the handbook mentions internet use, it relates only to in-school use. Specifically:

> Students are prohibited from accessing the Internet without a signed permission form; parents and students are required to sign a form and accept responsibilities and consequences contained therein. VPA intends that students will use the Internet only for appropriate, school-related applications and reserves the right to prohibit students from its use should non-school or unacceptable uses be detected.

*Id.* at 13. Finally, VPA's handbook includes a catch-all policy that "reserves the right to discipline students for conduct that occurs both on or off school grounds which is deemed detrimental to the reputation or culture of the school." *Id.* at 30. Both students and parents are obligated to sign an acknowledgment of the handbook, including a promise by parents "to immediately activate the signed consent to voluntarily withdraw my student(s) if I or any family member displays inappropriate conduct directed at the school or school personnel on or off school property (i.e., harassment, cursing, intimidation, defamation, obstinate or demanding actions, etc.)."[3] *Id.* at 63.

The VPA handbook provides for no hearing or appeal process. VPA states only that a student will be "informed of the consequences" of his or her actions if he or she is suspended, and that the "Administration will set up a conference with the parents or guardians to discuss ways to rectify violations." *Id.* at 30. VPA provides no steps whatsoever to challenge an expulsion.[4] *Id.*

VPA's overwhelmingly broad policy, allowing for discipline for any conduct deemed "detrimental" to the school, regardless of whether it occurs on school grounds, provides VPA with unchecked disciplinary power. Former VPA teachers attest that the school wielded this power with little restraint, describing widespread discipline, suspensions, and mandatory "voluntary

---

[3] Through this provision, VPA compels parents and guardians to withdraw their children from the school on threat of formal expulsion.

[4] Although VPA has a complaint procedure for the community to express concerns with the "curriculum, instructional materials, instructional strategies, and educational activities at school," it does not indicate that this procedure is available for appealing discipline or other administrative decisions, and at any rate, the school requires that these concerns be raised publicly, in writing, with the signature of the concerned party," and expressly warns that any party "who defames a CLA/VPA employee and damages a person's professional reputation, whether before students or any third party, may be subject to legal action brought by the employee." *Id.* at 54.

withdrawals" of students, with no recourse to fair hearings or appeals.  Former English teacher

Dianne Popenhagen declares that "policies did not have a particularly important relationship to

punishment. Punishment was far more arbitrary than that. If [Defendant Jajdelski] or another

administrator was angry, there would be a punishment." [**Ex. 11**, *Decl. of D. Popenhagen* at ¶ 82;

*see also id*. at ¶ 84 ("[t]hese policies were used to rationalize discipline after the fact, rather than

serve as its basis from the outset. VPA was a punish-first environment.")]. Former calculus teacher

Katie Strange agrees: "[T]he policies were enforced in a very selective and inconsistent way" and

"[s]tudents were often treated differently and had different disciplinary actions taken against them

for the same supposed infractions." [**Ex. 12**, *Decl. of K. Strange* at ¶¶ 19-20]. Consistent with the

student handbook, "[t]he imposition of student discipline at VPA was summary and fallacious.

There was no process by which students could challenge the accusations against them."  [**Ex. 11**,

*Decl. of D. Popenhagen* at ¶ 84]. "When a student was disciplined there was no way for them to

challenge the disciplinary decision."  [**Ex. 13**, *Decl. of Faten Taram* at ¶ 26].

## STANDARD OF REVIEW

An injunction under Rule 65 of the Federal Rules of Civil Procedure is an equitable remedy

designed to "forestall future violations." *Unites States v. Or. State Med. Soc.*, 343 U.S. 326, 333

(1952). "All it takes to make the cause of action for relief by injunction is a real threat of future

violation or a contemporary violation of a nature likely to continue to recur." *Id.* The primary

purpose of a preliminary injunction is to prevent irreparable injury to the moving party pending

the outcome of a lawsuit, giving the court time to render a substantive decision on the merits of

the case. *Penn v. San Juan Hosp., Inc.*, 528 F. 2d 1181, 1185 (10th Cir. 1975); *see Free the Nipple-*

*Fort Collins v. City of Fort Collins*, 237 F. Supp. 3d 1126, 1134 (D. Colo. 2017) (issuing a

preliminary injunction because any infringement of one's constitutional rights inflicts irreparable

injury). Moreover, where circumstances warrant, a court may properly issue an injunction to benefit those not before the court when others are also likely to suffer irreparable harm. *Brito v. Zia, Co.*, 478 F. 2d 1200, 1207 (10th Cir. 1973).

In the Tenth Circuit, to succeed on a motion for preliminary injunction, the movant must demonstrate the following four factors:

> (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits.

*Resolution Trust Corp. v. Cruce,* 972 F. 2d 1195, 1198 (10th Cir. 1992) (quoting *Tri-State Gen. & Trans. Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F. 2d 351 (10th Cir. 1986)); *Kikumura v. Hurley*, 242 F. 3d 950, 955 (10th Cir. 2001). When requesting an injunction that alters the status quo, the movant must make a "strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (quoting *Summum v. Pleasant Grove City*, 483 F. 3d 1044 (10th Cir. 2007)); *O Centro Espirita Beneficiente v. Ashcroft*, 389 F. 3d 973, 976 (10th Cir. 2004). Although no single factor is dispositive, courts consistently find that "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Hill v. Williams*, Civ. No. 16–cv–02627, 2016 WL 8667798, *12 (D. Colo. Nov. 4, 2016) (enjoining enforcement of a law prohibiting publication of completed ballots, including photographs on social media, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016)). Because discovery has not yet begun, courts must consider as true the facts asserted in the complaint or any affidavits in support of injunction until such time as an allegation is denied.

*Edmisten v. Weholtz*, 287 Fed. Appx. 728, 732 (10th Cir. 2008) (citing *Smotherman v. United States*, 186 F. 2d 676, 678 (10th Cir. 1950)).

## I. Irreparable Harm

Showing irreparable injury is necessary to obtain a preliminary injunction. *Sampson v. Murray*, 415 U.S. 61, 88 (1974); *Penn*, 528 F. 2d at 1185. Courts consistently hold that "the infringement of one's constitutional rights inflicts an irreparable injury" even if denial of rights occurs for "even minimal periods of time." *Free the Nipple-Ft. Collins*, 237 F.Supp.3d at 1134 (quoting *Elrod v. Burns*, 427 U.S. 347 (1976)); *see also Awad*, 670 F.3d at 1131 ("'[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'") (quoting *Kikumura*, 242 F.3d 950)); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. 2014) ("[w]hen an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary.") (footnotes omitted); *Hill v. Williams*, 2016 WL 8667798, at *9 ("[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed.").

### a. Joel and Mary Flores Continue to Suffer Irreparable Injury.

When Joel and Mary Flores, interviewed and filmed students outside of VPA following the student suspension, and then published an article about the student protest and the school's resulting actions, they were engaged in paradigmatic First Amendment protected activity. As a result of being barred from school grounds in retaliation for exercising their First Amendment rights, Joel and Mary Flores cannot participate in important milestones in their son's life, including attending his home sporting events, parent-teacher conferences or even picking him up or dropping him off from school grounds. As it stands now, the Flores parents will be unable to attend E.F.'s

high school graduation this year unless this Court intervenes. Moreover, their ability to engage in news gathering activities or access public officials has been unconstitutionally restricted, on threat of arrest and civil litigation. Similarly, VPA's threats of criminal and legal actions against the Flores parents for their critical press coverage of the school has chilled the exercise of their First Amendment rights. The Flores parents have refrained from publishing any other articles about VPA for fear of additional retaliation against E.F. These are the types of harms and injuries that cannot be remedied through financial compensation at a later date. Only through an immediate injunction allowing them to return to school grounds will the harm cease.

**b. Students at VPA Will Suffer Irreparable Injury Because of VPA's Enforcement of Unconstitutional Policies and Discipline Procedures.**

Because of the primacy of education in the shaping and success of future generations – Colorado has guaranteed students access to a free public education. *See* Colo. Const. Art. 9, § 2 (ensuring "a thorough and uniform system of free public school throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously."). As such, deprivation of this right without due process constitutes a violation of the Fourteenth Amendment. *See Goss v. Lopez*, 419 U.S. 565, 572-73 (1975) (on the basis of state law, plaintiffs were entitled to a free education such that due process was required).

In addition to the fact that Defendants' handbook policies violate the First Amendment insofar as the policies are overbroad and vague (*see* § IV(b)(i)), Defendants have repeatedly exploited the policies in the student handbook to suspend and expel – or force the voluntary withdrawal of – students, without any constitutionally-required procedural protections. [*See* **Ex. 13**, at ⁋ 26]. In fact, the school handbook requires parents to waive the due process rights of their children by having them promise "to immediately activate the signed consent to voluntarily withdraw my student(s) if I or any family member displays inappropriate conduct directed at the

school or school personnel on or off school property (i.e., harassment, cursing, intimidation, defamation, obstinate or demanding actions, etc.)." [**Ex. 10**, at 63]. Former teachers at VPA report rampant use of suspension, expulsion, and forced withdrawal. [*See, e.g.*, **Ex. 11** at ¶ 21 ("[i]t was well known at VPA that instead of expelling students, the school basically forcibly disenrolls them by pressuring parents into a signing voluntary disenrollment paperwork."); **Ex. 12**, at ¶ 32 ("it was a common occurrence that Mr. Jajdelski would pull parents and students into meetings and then the student would subsequently 'withdraw' from VPA. It was understood that the student would not be back and was not welcome back.")]. As such the Court should enjoin VPA from enforcing their disciplinary policies as a violation of students' First and Fourteenth Amendment rights, and that the school must start guaranteeing minimum due process to students who are suspended, expelled, or forced to withdraw from school. There can be little more harmful to the youth of this country than deprivation of their educational rights.

II.     **Balancing of Interests**

The second factor requires a balancing of interests, weighing the alleged irreparable harm to the movant with the burden imposed upon the non-moving party to comply with the injunctive relief. *Resolution Trust Corp.,* 972 F. 2d at 1198.

a.  **No Burden is Imposed in Restoring the Flores Parents to School Grounds.**

Compared to the irreparable injuries to Joel and Mary Flores, VPA will suffer little, if any inconvenience or burden by allowing them to return to school grounds. There is no financial cost or burden to VPA associated with allowing Joel and Mary Flores to return to school grounds – they are simply seeking the same access to the school that is enjoyed by all other parents. Neither are there any potential security risks or harm to students or the administration.  Although VPA claims that the Flores parents created an "unsafe situation [that] required police intervention," this

assertion was simply not true. The police were called to VPA *before* Joel and Mary Flores arrived to pick up their son. Moreover, VPA reported no problems concerning the Flores parents to the police and the police took no action against Joel or Mary Flores on September 28, 2017. [**Ex. 9**]. Rather, it was only *after* Joel and Mary Flores published their newspaper article that Defendants barred them indefinitely from school grounds, citing their news-gathering and reporting actions as basis for the exclusion. [**Ex. 8**]. As such, VPA will suffer no harm or burden allowing them equal access to school grounds as that enjoyed by other parents and guardians. Given the absence of any burden to VPA, this factor weighs heavily in favor of a preliminary injunction.

### b. Little Cost or Effort Is Needed to Revise Policies and Ensure Discipline Procedures Comply with Supreme Court Precedent.

The Supreme Court has long recognized that "'education is perhaps the most important function of state and local governments.'" *Goss*, 419 U.S. at 576. Mandating that VPA revise its policies and discipline procedures to conform with the First and Fourteenth Amendments will require little cost to VPA and only the modest efforts of implementation that are typical of any school policy. Financially, revising school policies and adopting compliant discipline procedures will cost VPA at most a few hours of attorneys' fees, if even that. The Colorado Department of Education, Adams County where the school is located, or the Colorado Charter School Institute all likely have model policies for member schools to consider.

Similarly, although modest effort by administrators might be required to ensure that students and their parents received notice of charges and a fair hearing before a student is suspended or expelled, schools are required to make these efforts by law, and so Defendants will only need to exert as much effort as is constitutionally required. As the Supreme Court observed:

> We do not believe that school authorities must be totally free from notice and hearing requirements if their schools are to operate with acceptable efficiency. Students facing temporary suspension have interests qualifying for protection of the Due Process Clause,

and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.

*Goss*, 419 U.S. at 581. The balancing of interests in this case weighs in favor of an injunction.

## III.    The Public Interest

The third factor requires a showing that the issuance of an injunction is not adverse to the public interest. *City of Chanute v. Kansas Gas & Electric Co.*, 754 F. 2d 310, 312 (10th Cir. 1985). Not only would an injunction not be adverse to the public interest, but the public interest would benefit by the issuance of an injunction.

First, Joel and Mary Flores publish one of the most widely-circulating monolingual Spanish-language newspapers in Colorado. As the Supreme Court has noted, "[e]nlightened choice by an informed citizenry is the basic ideal upon which an open society is premised, and a free press is thus indispensable to a free society." *Branzburg v. Hayes*, 408 U.S. 665, 726-27 (1972) (quoting *Estes v. Texas*, 381 U.S. 532 (1965)). By retaliating against the Flores parents for their press activities, including threatening them with legal and criminal sanctions, VPA has silenced an important news source for the Spanish-speaking community about the school.

Second, Student Plaintiffs and the entire VPA student body continue to have their First and Fourteenth Amendment rights suppressed. An injunction enjoining the school from enforcing unconstitutional student policies and discipline procedures would protect many students, making it especially beneficial to the public interest.

## IV.    Substantial Likelihood of Success

If the moving party satisfies the other three requirements for a preliminary injunction, this element becomes more lenient. *Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1552 (D.

Kan. 1993). In such circumstances, to show a probability of success, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for deliberative investigation." *Otero Savings & Loan Assoc. v. Fed. Reserve Bank*, 665 F. 2d 275, 278 (10th Cir. 1981). Under any standard, Plaintiffs can make this showing.

    **a. Joel and Mary Flores Are Likely to Succeed in their First Amendment Retaliation and Due Process Claims.**

Joel and Mary Flores are likely to succeed on their First Amendment retaliation and Fourteenth Amendment claims. As an initial matter, courts have universally confirmed the value of news-collecting as paramount to the First Amendment. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) ("[t]here is an undoubted right to gather news 'from any source by means within the law. . .'"). While the First Amendment may not grant the press special access or affirmatively compel parties to supply information, the Constitution does protect press access to any publicly accessible and legally obtainable information. *Id.*; *see also W. Watershed Project v. Michael,* 869 F. 3d 1189, 1197 (10th Cir. 2017) (finding that Wyoming law infringed on plaintiff environmental organization's speech by targeting and suppressing "collecting resource data").

Additionally, courts have widely recognized a person's First Amendment interest in speaking with and recording public officials, including school administrators and the police. *See Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017) (plaintiffs' First Amendment rights violated when police confiscated phones and issued citations in retaliation for recording activities); *W. Watershed Project,* at 1196 (10th Cir. 2017) ("[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs."); *Cyr v. Addison Rutland Supervisory Union*, 60 F.Supp.3d 536, 548 (D. Vt. 2014) (holding that a categorical ban

of father from school board meetings violated his First Amendment right of free expression).

Here, Defendants all but admit that they excluded Joel and Mary Flores from school grounds because of their First Amendment activity. In the notice provided to the Flores parents, Defendants asserted that they *"intentionally chose to create a false narrative with students, the public, and the media regarding the VPA student activities and school administration decisions"* and faced criminal or legal action because of the *"perpetuation of information which is false and manipulative regarding Victory Preparatory Academy."* [**Ex. 8**]. With all this evidence of retaliatory motive, there is little doubt that Joel and Mary Flores have met the threshold of this requirement. *See Cyr*, 50 F. Supp. 3d at 549 ("a categorical ban on expressive speech singling out an individual does not even satisfy the lower threshold of reasonableness review.").

### b. Student Plaintiffs Are Likely to Succeed on Their Constitutional Claims.

This Motion raises two sets of due process concerns: (1) that the policies found in the student handbook encroach on protected speech or are exploited by administrators to do so; and (2) that there is a lack of minimal protections before students are deprived of their education.

### i. VPA's Policies Violate the First and Fourteenth Amendments.

It is well established that schools may not unduly curtail the speech of students. Under the First Amendment, students retain the right to engage in political speech and protest at school. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (holding that "[n]either students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). In accordance with *Tinker* and its progeny, courts across the country have enjoined schools from enforcing written policies that infringe on students' protected speech. *See, e.g., Eagle Point Education Ass'n v. Jackson Sch. Dist. No. 9*, 880 F.3d 1097, 1107-09 (9th Cir. 2018) (striking two school policies that prohibited signs and banners unless students obtained

written pre-approval from the superintendent); *T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.*, 807 F.Supp.2d 767, 787-89 (N.D. Ind. 2011) (school code requiring students to "demonstrate good conduct at school and outside of school" deemed unconstitutional after school suspended plaintiffs from sports for posting sexually parodic pictures on social media website); *Killion v. Franklin Reg. Sch. Dist.*, 136 F.Supp.2d 446, 451, 458-59 (W.D. Pa. 2001) (summary judgment for plaintiff student after school suspended him without prior notice for violating policy against verbal abuse where abuse was undefined); *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 700-01 (W.D. Pa. 2003) (enjoining enforcement of school policy that including terms such as "abuse," "abusive," "harassment," "inappropriate," and "offend," because such terms were not defined in "any significant manner" and "not linked within the text to any geographical limitations.").

Generally, courts scrutinize school policies for unconstitutional vagueness or overbreadth just as they do other laws. A school policy violates the First and Fourteenth Amendment "when it grants a public official 'unbridled discretion' such that the official's decision to limit speech is not constrained by objective criteria but may rest on 'ambiguous and subjective reasons.'" *T.V.*, 807 F. Supp. 2d at 787. Thus, a policy is unconstitutionally overbroad if it suppresses constitutionally protected speech as well as speech that is not protected. *See id.* A policy is unconstitutionally vague "if it does not allow a person of ordinary intelligence to determine what conduct it prohibits, or if it authorizes arbitrary enforcement." *T.V.*, 807 F.Supp.2d at 787; *see also O'Connor v. City and Cnty. of Denver*, 894 F.2d 1210, 1222 (10th Cir. 1990) (describing a law as unconstitutionally vague if it is "so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application.") (quoting *Connally v. General Constr. Co.*, 296 U.S. 385 (1926)). "Unconstitutional vagueness may also take the form of an 'unrestricted delegation of power,' where a statute leaves the definition of its terms to the enforcing officers and thereby

invites arbitrary and overzealous enforcement." *T.V.*, 807 F.Supp.2d at 787.

Here, VPA's written policies are significantly broader than any of the policies found unconstitutional by courts above. [*See* **Ex. 10**]. VPA's policies prohibit students from engaging in "inappropriate behaviors," "disrespectful behaviors," "street language," "negative tones," "mak[ing] demands to the school and or staff," and "refus[ing] to leave school grounds." [*Id.* at 2, 6-7, 30]. The school reserves the, "right to discipline students for conduct that occurs both on or off school grounds which is deemed determinantal to the reputation or culture of the school." *Id.* The school also requires that students, "both inside and outside the classroom . . . conduct themselves in such a manner as to be a credit to themselves and to their school." *Id.* at 6-7. None of these requirements are defined or limited in any way and they have consistently been used to suppress the free speech of VPA students. [*See id.*]. Three of the Student Plaintiffs, including E.F., M.F., and J.F remain enrolled at VPA and subject to these policies, as do the rest of their student peers. Considering the administration's pattern of abuse of these policies, and because they are facially unconstitutionally overbroad and vague, the Court should enjoin their enforcement.

### ii.  VPA's Discipline Procedures Violate Due Process.

Because the U.S. Constitution provides that no state shall deprive any person of liberty or property "without due process of law," the Supreme Court long ago confirmed that schools must provide students with both substantive and procedural due process before removing them from school. *See Goss*, 419 U.S. at 572-84 (discussing minimum notice and hearing requirements); *Carey v. Piphus*, 435 U.S. 247 (1978) (holding that students could seek nominal damages regardless of whether their suspensions were substantively justified because they had not received fair hearings and "the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions. . .").

"Substantive due process 'bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.'" *Cyr*, 955 F.Supp.2d at 298 (quoting *Zinermon v. Burch*, 494 U.S. 113 (1990)). Conversely, procedural due process is concerned with, "the fairness of the procedure by which government action denies a constitutionally protected interest in life, liberty, or property." *Id*. What constitutes fair process in turn requires a two part-inquiry: First, the court must ascertain if the plaintiff's claim is predicated on an established state procedure, or, secondly, if it is based on a random, unauthorized act by a state employee. *Id.* at 296 (citing *Rivera–Powell v. N.Y. City Bd. of Elections,* 470 F.3d 458 (2d Cir. 2006)). In the case of random acts, "a meaningful post-deprivation remedy automatically satisfies deprivations caused by random, unauthorized acts." *Id.* Otherwise, in instances of established state procedure, courts engage in the following three-pronged analysis, otherwise called the *Mathews* test:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews v. Elridge*, 424 U.S. 319 (1976)).

Here, multiple former employees of VPA have attested to the frequent suspension and forcible "voluntary withdrawal" or expulsion of students, most notably Defendant Jajdelski. Before suspension or expulsion, students are not provided notice or a hearing, and the decisions to suspend or expel are pre-determined before speaking with students. According to witnesses, VPA frequently acts arbitrarily, depriving students of their educational rights for minor or non-existent infractions of policies, often at the mere whim of school administrators. There is no "post-deprivation" appeal process. VPA's written policies provide no grounds or mechanism for students to challenge their discipline, and in fact requires parents "to immediately activate the signed

consent to voluntarily withdraw my student(s) if I or any family member displays inappropriate conduct directed at the school or school personnel on or off school property (i.e., harassment, cursing, intimidation, defamation, obstinate or demanding actions, etc.)." [**Ex. 10**, at 63]. The Supreme Court long ago determined that notice and fair hearing, and absent that, appeals, are required before depriving students of their educational rights. Since none of these minimal requirements were or are now afforded to students at VPA, the Student Plaintiffs are likely to succeed on their due process claims.

## CONCLUSION

Financial compensation for past harms will be left for the jury to decide, but preliminary injunctive relief will prevent immediate and irreparable harm from continuing. Based on the foregoing, Plaintiffs request that the Court enter a preliminary injunction that does the following:

1. Precludes Defendants from excluding Joel and Mary Flores from school grounds or limiting their access to events otherwise accessible to other guardians or to the public;

2. Enjoins Defendants from enforcing the student policies discussed in this motion;

3. Enjoins Defendants from suspending and/or expelling students, including mandating their "voluntary withdrawal," without procedural due process;

4. Requires Defendants to confidentially identify and provide contact information for all the students suspended, expelled, or who "voluntarily withdrew" from VPA from 2017 to present, so that Plaintiffs' counsel or the Court may notify these students of the injunction and their right to fair notice and to request a hearing or appeal of the decision.

5. Requires Defendants expunge all records of suspension or expulsion from student files.

Respectfully Submitted,     _s/ Iris Halpern_____
                             Iris Halpern
                             Nicholas A. Lutz
                             Matthew J. Cron
                             2701 Lawrence Street, Suite 100
                             Denver, Colorado 80205
                             (303) 578-4400
                             ih@rmlawyers.com
                             RATHOD | MOHAMEDBHAI LLC - ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2018, I electronically filed the foregoing **PLAINTIFFS' MOTION FOR PRELIMINARY INJUCNTION** with the Clerk of the Court using the CM/ECF system, which will send electronic notification to the following:

Daniel P. Spivey
Michael Brent Case
Semple, Farrington, Everall & Case, P.C.
1120 Lincoln Street, Suite 1308
Denver, CO 80203
(303) 595-0941
dspivey@semplelaw.com
bcase@semplelaw.com

*Attorneys for Defendants*

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern